AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )        Case No. 3:23-mj-00422
)
Subject Devices 1 and 2, currently located at the )
Montgomery County Sheriff's Office, )
345 W. Second Street, Dayton, Ohio 45422 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | SEE ATTACHMENT C |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Frederick D. Zollers, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means)*.

Date: 10/11/23

City and state: Dayton, Ohio

Peter B. Silvain, Jr.
**United States Magistrate Judge**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF **SUBJECT DEVICES 1 and 2**, CURRENTLY LOCATED AT THE MONTGOMERY COUNTY SHERIFF'S OFFICE, 345 W. Second Street, Dayton, Ohio 45422 | Case No.  3:23-mj-00422 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Frederick D. Zollers**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—the listed electronic devices—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), assigned to the Cincinnati Division, Dayton, Ohio Resident Agency. I am therefore an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878. Moreover, I am an "investigative law enforcement officer" within the meaning of 18 U.S.C. § 2510. I've been a sworn law enforcement officer in the State of Ohio for seventeen years. I am presently a sworn member of the Montgomery County Sheriff's Office ("MCSO"). I am currently assigned to the FBI Southern Ohio Safe Streets Task Force ("SOSSTF") as a TFO.

3.      I have been involved in narcotics-related arrests; the execution of search warrants which resulted in the seizure of narcotics; and supervised the activities of informants who provided information and assistance resulting in drug buys.  Since 2014, I received training and experience in interviewing and interrogation techniques; arrest, search and seizure procedures; narcotics investigations; and various other criminal investigations resulting in successful prosecution.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.  In the course of conducting narcotics investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized wire and oral interception electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and evidence of criminal activity.  I have repeatedly encountered the practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone."  The money phone is used primarily to communicate with those customers.  The customers will subsequently call or send a text message to the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. Based on training and experience, I know drug traffickers often possess and use multiple cellular phones.  Through my training, I have become familiar with coded terminology utilized by drug trafficking organizations to disguise their illegal activities and the way they conduct these illegal activities.

2

4.      Along with other agents, task force officers, and law enforcement officials, I am currently involved in the investigation of drug trafficking and firearms offenses committed by David MINOR – including violations of: 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a telephone communication facility to facilitate a drug trafficking crime); 21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances); 21 U.S.C. § 856 (maintaining a drug premises); 18 U.S.C. § 924(c) (possession of a firearm during a drug trafficking crime); and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) (hereinafter and collectively "Subject Offenses"). I have personally participated in this investigation and have spoken to, as well as received information from, other agents and investigators participating in this matter. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched are two electronic devices, hereinafter listed as **DEVICE-1** and **DEVICE-2**. The Devices are currently located at the Montgomery County Sheriff's Office, 345 W. Second Street, Dayton, Ohio and further described as follows:

   a. **DEVICE-1**: silver/blue Apple iPhone 13 Pro Max, Model A2484, IMEI: 35950820120054.

   b. **DEVICE-2:** black Apple iPhone 7, Model A1660, IMEI: 359463086579239.

3

(collectively, the "Subject Devices"). The Subject Devices are described in Attachment A, which is incorporated by reference.

6. I believe that there is probable cause to believe that evidence of the Subject Offenses will be found on the Subject Devices. The applied-for warrant would authorize the forensic examination of the Subject Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. In August of 2023, members of the Regional Agencies Narcotics and Gun Enforcement Task Force ("RANGETF") and members of the FBI Southern Ohio Safe Streets Task Force ("SOSSTF") conducted a drug trafficking investigation. Task Force Officer ("TFO") Andrew McCoy received information from RANGETF confidential informant (hereafter "CI") regarding a black male trafficking large amounts of fentanyl and methamphetamine in and around Montgomery County, Ohio. The CI advised that he/she knows the male as "Zo" and that "Zo" uses cellular telephone number (937) 684-5776 to facilitate drug sales. The CI also stated that "Zo" normally directs customers to a location off Westbrook Road to conduct drug sales. The CI stated that he/she knows "Zo" to drive a black Chevrolet sedan when conducting drug sales. TFO McCoy considers the CI to be reliable, as the CI has provided information and services to TFO McCoy in the past that has led to the issuance of state and federal search warrants, the seizure of narcotics, firearms, other illegal items, U.S. currency, and the successful prosecution of criminal defendants. The CI is assisting law enforcement in exchange for monetary compensation.

4

8.     During the week of August 28, 2023, TFO McCoy met with the CI in regard to conducting a controlled purchase of methamphetamine from the subject that he/she knows as "Zo". At TFO McCoy's direction, the CI had previously called (937) 684-5776 to order an amount of methamphetamine. The CI advised that an unknown male had answered the phone and agreed to the sale. The CI later sent a text message to the same phone number and the user of the phone number agreed to the sale of 2 ounces of methamphetamine for $300, also directing the CI to let them know when the CI was 15 minutes away from the Dayton area. The CI was searched, outfitted with a wireless transmitter for security purposes, and provided the appropriate amount of serialized RANGETF buy funds. The CI then placed another phone call to (937) 684-5776 to receive further directions. The male that answered the phone directed the CI to the area of Westbrook Road and Seybold Road. The CI identified the voice of the male subject on the phone as the subject that he/she knows as "Zo". The CI then departed the meeting location and traveled to the location to which he/she had been directed. The CI was kept under constant surveillance as he/she traveled from the prearranged meeting location.

9.     Once the CI arrived in the area of Westbrook Road, he/she called (937) 684-5776 again and spoke with the same male who he/she had just spoken with. The CI was directed to turn right onto Crestway Drive from Westbrook Road. RANGETF surveillance units observed a black 2014 Chevrolet Impala bearing Ohio registration JSA1186 meet up with the CI's vehicle on Crestway Drive near Kimmel Road. Task force members monitored the wireless transmitter. The conversation that was heard between the CI and the occupant of the black Chevrolet Impala was consistent with other conversations that have been heard during past controlled purchases of narcotics. After a short time, the CI and the black 2014 Chevrolet Impala parted ways, and both

left the buy location. The CI was kept under constant surveillance as he/she traveled from the buy location to the prearranged meeting location.

10. Task force members surveilled the black 2014 Chevrolet Impala after it left the buy location. A short time after the controlled purchase, the driver of the Chevrolet Impala flagged me down while I was operating an unmarked vehicle in the area. During this interaction, the driver of the Impala identified himself as "Zoe" and offered to sell me narcotics. "Zoe" provided me with phone number (937) 684-5776 as the phone number to reach him at for drug sales.

11. After the buy, TFO McCoy met the CI and he/she turned over the suspected methamphetamine. TFO McCoy debriefed the CI and he/she confirmed the driver of the black 2014 Chevrolet Impala had conducted the drug transaction with him/her. The suspected methamphetamine had an approximate field weight of 57.4 grams. The suspected methamphetamine was submitted to the Miami Valley Regional Crime Laboratory ("MVRCL") to be analyzed for content. Lab results revealed 56.10 grams of a mixture of substance containing a detectable amount of methamphetamine.

12. TFO McCoy later checked the registration of the black 2014 Chevrolet Impala and found that it was registered to one Doniqua Johnson. Through various law enforcement databases, RANGETF Intelligence Analyst A. Stayonovich was able to link Doniqua Johnson to a subject by the name of David Minor (hereinafter "MINOR"). TFO McCoy found that on August 18, 2023, MINOR was issued a traffic citation in the City of Englewood (VMC citation #0057180000200081823001) while operating the black 2014 Chevrolet Impala bearing Ohio registration JSA1186. I was later shown a State of Ohio BMV photograph of MINOR and I

identified MINOR as the subject who had identified himself as "Zoe" and offered to sell me narcotics.

13.     On August 31, 2023, task force members conducted a controlled buy from MINOR. I acted in an undercover capacity and sent a text message to "Zoe" at (937) 684-5776 and ordered one ounce of methamphetamine. The user of phone number (937) 684-5776 agreed to the sale. I was outfitted with a wireless transmitter for security purposes and provided the appropriate amount of serialized RANGETF buy funds. Once I arrived in the area of Hoke Road and I-70, I placed a series of phone calls to (937) 684-5776. The male subject that answered the phone eventually directed me to Seybold Road off East Westbrook Road. As I was traveling north on Seybold Road, just south of East Westbrook Road, I observed a black 2014 Chevrolet Impala traveling south towards my undercover vehicle. The black Impala stopped next to my undercover vehicle on Seybold Road and the driver of the Impala handed me a clear plastic sandwich bag containing suspected methamphetamine. In exchange, I handed the driver the serialized RANGETF buy funds. I was able to positively identify the driver of the black Impala as MINOR. As MINOR was driving away from Seybold Road, TFO McCoy was able to verify that the license plate on the black 2014 Chevrolet Impala was JSA1186. MINOR was last observed driving north on Union Road from East Westbrook Road.

14.     TFO McCoy field tested the suspected methamphetamine that I purchased from MINOR and the substance tested positive for the presence of methamphetamine. The suspected methamphetamine had an approximate field weight of 29.0 grams. The suspected methamphetamine was submitted to the MVRCL to be analyzed for content. Lab results revealed 27.93 grams of a mixture of substance containing a detectable amount of methamphetamine.

7

15.     On September 5, 2023, task force members conducted a controlled buy from MINOR. I acted in an undercover capacity and sent a text message to "Zoe" at (937) 684-5776 and ordered four ounces of methamphetamine. The user of phone number (937) 684-5776 agreed to the sale. I was outfitted with a wireless transmitter for security purposes and provided the appropriate amount of serialized RANGETF buy funds. Once I arrived in the area of Hoke Road and I-70, I placed a phone call to (937) 684-5776. Through a series of phone calls to and from (937) 684-5776, I was eventually directed to Seybold Road off of East Westbrook Road. As I was traveling north on Seybold Road, just south of East Westbrook Road, I observed a black 2014 Chevrolet Impala traveling south towards my undercover vehicle. The black Impala stopped next to my undercover vehicle on Seybold Road and the driver of the Impala handed me a clear plastic sandwich bag containing suspected methamphetamine. In exchange, I handed the driver the serialized RANGETF buy funds. I was able to positively identify the driver of the black Impala as MINOR. As MINOR was driving away from Seybold Road, TFO McCoy was able to verify that the license plate on the black 2014 Chevrolet Impala was JSA1186. MINOR was last observed turning south onto Southview Drive from West Wenger Road in the City of Englewood. A short time later, Detective Hutson observed the black 2014 Chevrolet Impala backed into the garage of 829 Southview Drive in the City of Englewood.

16.     TFO McCoy field tested the suspected methamphetamine that I purchased from MINOR and the substance tested positive for the presence of methamphetamine. The suspected methamphetamine had an approximate field weight of 112.4 grams. The suspected methamphetamine was submitted to the MVRCL to be analyzed for content. Lab results revealed 111.35 grams of a mixture of substance containing a detectable amount of methamphetamine.

17. On September 7, 2023, task force members conducted a controlled buy from MINOR. I acted in an undercover capacity and sent a text message to "Zoe" at (937) 684-5776 and ordered four ounces of methamphetamine. The user of phone number (937) 684-5776 agreed to the sale. I was outfitted with a wireless transmitter for security purposes and provided the appropriate amount of serialized RANGETF buy funds. Once I arrived in the area of Hoke Road and I-70, I placed a phone call to (937) 684-5776. The male subject that answered the phone directed me to Seybold Road off of East Westbrook Road. A short time after this phone call, RANGETF surveillance units observed the black 2014 Chevrolet Impala bearing Ohio registration JSA1186 pull out of the garage at 829 Southview Drive in the City of Englewood. The Chevrolet Impala traveled from 829 Southview Drive to Seybold Road off of East Westbrook Road. As I was traveling north on Seybold Road, just south of East Westbrook Road, I observed the black 2014 Chevrolet Impala traveling south towards my undercover vehicle. The black Impala stopped next to my undercover vehicle on Seybold Road and the driver of the Impala handed me a clear plastic sandwich bag containing suspected methamphetamine. In exchange, I handed the driver the serialized RANGETF buy funds. I was able to positively identify the driver of the black Impala as MINOR. As MINOR was driving away from Seybold Road, RANGETF surveillance units were able to follow him back to 829 Southview Drive in the City of Englewood. Once MINOR arrived at 829 Southview Drive, he backed the black 2014 Chevrolet Impala into the garage of the residence and the garage door was shut a short time later.

18. TFO McCoy field tested the suspected methamphetamine that I purchased from MINOR and the substance tested positive for the presence of methamphetamine. The suspected methamphetamine had an approximate field weight of 113.4 grams. The suspected methamphetamine was submitted to the MVRCL to be analyzed for content. Lab results

9

revealed 112.22 grams of a mixture of substance containing a detectable amount of methamphetamine.

19.     By conducting an open-source database search, RANGETF Intelligence Analyst A. Stayonovich was able to link 829 Southview Drive to a subject by the name of Tenise Ivy-Marsh (hereinafter "Ivy-Marsh"). TFO McCoy found that Ivy-Marsh had visited MINOR in October of 2019 when MINOR was incarcerated at the Montgomery County (OH) Jail.

20.     On September 12, 2023, task force members conducted a controlled buy from MINOR. I acted in an undercover capacity and sent a text message to "Zoe" at (937) 684-5776 and ordered four ounces of methamphetamine. The user of phone number (937) 684-5776 agreed to the sale. I was outfitted with a wireless transmitter for security purposes and provided the appropriate amount of serialized RANGETF buy funds. Once I arrived in the area of I-70 in western Montgomery County, I placed a phone call to (937) 684-5776. The male subject that answered the phone directed me to go turn right onto Hoke Road and to call him back. Once I arrived on Hoke Road, I called (937) 684-5776 again and was directed to turn left onto Seybold Road from East Westbrook Road. Once I turned onto Seybold Road, I called (937) 684-5776 again the male subject that answered the phone told me that he was about to weigh the methamphetamine and then he would meet with me. The male subject directed me to park in a parking area on Seybold Road just south of Snake Road. A short time after this phone call, law enforcement surveillance units observed the black 2014 Chevrolet Impala bearing Ohio registration JSA1186 pull into the driveway of 829 Southview Drive in the City of Englewood. MINOR was observed exiting the driver's seat of the Impala and entering the residence through the overhead garage door. MINOR remained inside of the residence for a short period of time, then returned to the driver's seat of the black 2014 Chevrolet Impala. MINOR then left 829

10

Southview Drive, followed by law enforcement surveillance units. At the same time MINOR was observed leaving 829 Southview Drive, I received a text message from (937) 684-5776 that stated, "I be there in a minute". MINOR drove directly from 829 Southview Drive to Seybold Road, just south of East Westbrook. As I was traveling on Seybold Road, I observed the black 2014 Chevrolet Impala traveling towards me. The black Impala stopped next to my undercover vehicle on Seybold Road and the driver of the Impala handed me a clear plastic sandwich bag containing suspected methamphetamine. In exchange, I handed the driver the serialized RANGETF buy funds. I was able to positively identify the driver of the black Impala as MINOR.

21.    TFO McCoy field tested the suspected methamphetamine that I purchased from MINOR and the substance tested positive for the presence of methamphetamine. The suspected methamphetamine had an approximate field weight of 113.3 grams. The suspected methamphetamine was submitted to the MVRCL to be analyzed for content. Lab results revealed 110.70 grams of a mixture of substance containing a detectable amount of methamphetamine.

22.    On September 14, 2023, task force members conducted an operation involving a buy-bust and execution of a search warrant at 829 Southview Drive. TFO McCoy obtained a state search warrant for MINOR's person, the 2014 Chevrolet Impala, and the residence of 829 Southview Drive on September 12, 2023. The search warrant was authorized by the Honorable Montgomery County Common Pleas Court Judge Gerald Parker.

23.    Following a detailed briefing, task force members and aerial surveillance established surveillance in the area of 829 Southview Drive. At approximately 12:43 p.m., surveillance members observed a black Chevrolet Impala back into the garage of 829 Southview

Drive. At approximately 12:59 p.m., surveillance members observed the same black Chevrolet Impala exit the garage and depart from 829 Southview Drive. Task force members obtained the license plate on the Chevrolet Impala, verifying it was the Chevrolet Impala that MINOR was known to drive and had driven to prior drug deals.

24. While surveillance was actively being conducted on the Chevrolet Impala, I acted in an undercover capacity and placed a controlled call to cellular phone number (937)684-5776 (approximately 1:04 p.m.). I spoke with a male who I recognized from prior conversations to be MINOR. I arranged to purchase a "whole" (street term for one pound of methamphetamine). MINOR directed me to call back when close.

25. Aerial surveillance surveilled the Chevrolet Impala to the area of Seybold Road and Snake Road, where they observed the driver of the Chevrolet Impala engage in a suspected car-to-car drug transaction with another vehicle. Both vehicles then departed the area and aerial surveillance continued to surveil the Chevrolet Impala. The Chevrolet Impala drove to the area of 724 Webster Street, Dayton, Ohio and parked. Aerial surveillance observed the single occupant black male driver exit the Chevrolet Impala and walk toward 724 Webster Street. Task force members drove to the area of 724 Webster Street and observed MINOR exiting a grey in color northwest side door with a number "2" on it. TFO Dustin Phillips observed that MINOR had a large bulge, consistent with the size of one pound, concealed in his left front shorts pocket. Additionally, TFO Phillips observed a grey plastic baggie partially sticking out of MINOR's left front shorts pocket. TFO Phillips observed another black male, later identified as Kevin Byrd (hereinafter Byrd), look out from the door that MINOR exited. Byrd looked up and down the street and then shut the door, remaining inside the building.

12

26.     Aerial surveillance continued to surveil MINOR as he re-entered the Chevrolet Impala and departed the area.     After MINOR departed, task force members maintained surveillance at 724 Webster Street.  As surveillance was being maintained on MINOR, I spoke with MINOR via cell phone number (937) 684-5776 and MINOR initially directed me to park and wait at the Walmart parking lot of Hoke Road.  After MINOR departed 724 Webster Street, he ultimately directed me to drive to the area of Seybold Road and Westbrook Road, where the prior controlled buys had occurred.  At approximately 2:05 p.m., I met with MINOR on Seybold Road south of Westbrook Road.  I provided MINOR with the documented RANGETF buy-funds in exchange for a large quantity of suspected methamphetamine.  After conducting the drug deal, MINOR departed the area.  Aerial surveillance continued to surveil MINOR.

27.     Task force members coordinated with a marked cruiser and attempted to initiate a traffic stop on MINOR at approximately 2:11 p.m.  MINOR fled from the traffic stop in the Chevrolet Impala.  Aerial surveillance continued to surveil MINOR as he fled in the Chevrolet Impala.  MINOR drove in a reckless manner that created a substantial risk of serious physical harm to other motorists for a period of approximately fifteen minutes throughout the Dayton area.  Ultimately, MINOR drove to the area of Fountain Avenue where he bailed from the Chevrolet Impala and attempted to flee on foot.  MINOR was apprehended behind 59 Fountain Avenue.

28.     Pursuant to MINOR's arrest, task force members searched his person and the Chevrolet Impala.   Task force members seized **DEVICE-1** from MINOR's person and **DEVICE-2** from inside of the Chevrolet Impala.

29.     TFO McCoy field tested the suspected methamphetamine that I purchased from MINOR and the substance tested positive for the presence of methamphetamine.  The suspected

13

methamphetamine had an approximate field weight of 441 grams. The suspected methamphetamine was submitted to the MVRCL to be analyzed for content. Lab results revealed 431 grams of a mixture of substance containing a detectable amount of methamphetamine.

30.     Task force members continued surveillance at 829 Southview Drive while MINOR was fleeing from law enforcement. Task force members initiated contact with Ivy-Marsh as she attempted to depart the garage of the residence driving a 2019 grey Ford Fusion. Task force members detained Ivy-Marsh and executed the search warrant at 829 Southview Drive. Pursuant to the search warrant, task force members located a large quantity of suspected controlled substances and drug processing equipment in the trunk of the 2019 grey Ford Fusion. The suspected narcotics were confirmed by a laboratory as follows:

- 201.96 grams of 6-MAM, Fentanyl, and para-Fluorofentanyl;

- 13.13 grams of Fentanyl;

- 25.34 grams of Fentanyl and para-Fluorofentanyl;

- 3. 95 grams of 6-MAM and Fentanyl;

- 11.37 grams of Fentanyl;

- 3.72 grams of Xylazine;

- 1.54 grams of Fentanyl and Heroin;

- 5.62 grams of Fentanyl and Heroin;

- 15.06 grams of Fentanyl;

- 15.34 grams of fentanyl and Heroin;

- 6 grams of Xylazine;

- 326 grams of Methamphetamine; and

14

- 165.8 grams of Fentanyl.

31.     Additionally, task force members located the following but not limited to items; a large amount of U.S. currency and four firearms inside of 829 Southview Drive. The firearms included a Ruger LC9 with serial number 457-99169, a Taurus Judge with serial number DT254049, a Taurus Ultra Lite 380 with serial number G010044, and a Ruger AR-556 with serial number 857-81602. The Taurus Judge, the Taurus Ultra Lite, and the Ruger AR-556 were all found to be entered stolen firearms. Based on training and experience, I know that drug traffickers utilize firearms to protect their drugs and drug proceeds.

32.     SA Buzzard conducted a post-Miranda with MINOR. In summary, MINOR said he called Ivy-Marsh when he was fleeing from law enforcement. MINOR claimed ownership of all the narcotics and firearms located at 829 Southview Drive.

33.     On September 15, 2023, MINOR was arrested on various drug trafficking and firearms charges related to the incident on September 14, 2023, and the undercover buys preceding this date. *See* Southern District of Ohio Case No. 3:23-mj-383. On September 26, 2023, a Grand Jury charged MINOR by Indictment with various drug trafficking and firearms offenses related to the incident on September 14, 2023, and the undercover buys preceding this date. *See* Southern District of Ohio Case No. 3:23-cr-90.

34.     Based on training and experience, I know that drug traffickers frequently use cellular phones to carry out their activities. They use cellular phones to communicate with customers, their associates, and their suppliers. It is often common for drug traffickers to have multiple phones because certain phones may be used only for certain purposes. For instance, a trafficker may use one phone just to speak to his supplier, while using a different phone to speak only to his customers. This is a counter-surveillance technique intended to make it harder for

law enforcement to identify the user of the phones and his associates. Traffickers commonly use prepaid cellular phones to hide their identity as the user because they generate no billing information, often require little to no identifying information to activate, can sometimes be activated using an alias, and can be easily disposed of should the trafficker believe that law enforcement has identified the phone number.

35.   I also know that traffickers commonly text message each other or their customers, such as meeting locations, prices, and other information needed to carry out the sale of drugs (sometimes in code). They commonly store phone numbers for their associates and customers in the electronic phone book/contacts list, often under alias or code names. I know that traffickers will sometimes use the cellular phone to take photographs or videos of themselves, their location, their product, or their associates, which can be electronically stored on the cellular phone. Information can also be downloaded from the internet onto the cellular phone, such as email, social network information (like "Facebook"), travel information like maps or directions, or photographs. Call data, such as missed calls, received calls, or dialed calls are often electronically stored in the cellular phone. The information electronically stored on a phone can also be evidence of who possessed or used a cellular phone at a given time, can contain direct evidence of drug trafficking acts, and can help identify drug trafficking locations or associates. I am aware that there are tools to extract electronic data from a cellular phone so that law enforcement can review it for items of evidentiary value.

36.   I believe concealed within the Subject Devices are the numbers associated with that cellular phone, names, text messages, voice mail messages, photographs/videos, contact numbers, addresses, related stored information, call logs, and any deleted information for individuals involved in the purchase, transportation, and/or distribution of illegal narcotics.

16

Specifically, I believe the Subject Devices will contain names and phone numbers of co-conspirators (both drug suppliers and drug customers) in the contact list, calls to other co-conspirators in the call log and text messages to those same co-conspirators that can be used as evidence of possession with the intent to distribute and to distribute controlled substances and conspiracy to do the same (21 U.S.C. § 841(a)(1) and 846) and use of a communication device to facilitate a crime (21 U.S.C. § 843(b)).

37.     I believe the Subject Devices will contain the information listed above based upon law enforcement's surveillance of MINOR, BYRD, and Ivy-Marsh.  Further, based upon my prior training and experience in narcotics investigations, it is my considered opinion that individuals who engage in drug trafficking commonly utilize cellular telephones to generate and receive voice messages, text messages, WhatsApp messages by and between associates, colleagues, and co-conspirators and also to track and sell drug shipments.  Those engaging in drug trafficking commonly use cellular telephones to notify/alert co-conspirators of the arrival of a shipment, to arrange for its pick-up and to deposit money.

38.     The Subject Devices are currently in the lawful possession of the Montgomery County Sheriff's Office, 345 W. Second Street, Dayton, Ohio.  In my training and experience, I know that the Subject Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of the Montgomery County Sheriff's Office.

## TECHNICAL TERMS

39.     Based on my training and experience, I use the following technical terms to convey the following meanings:

17

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.

18

This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

19

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

20

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

40.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Subject Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience,

examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

41.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

42.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

44.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

45.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Frederick D. Zollers
Task Force Officer
Federal Bureau of Investigations

Subscribed and sworn to before me
on October 11, 2023,

Peter B. Silvain, Jr.
United States Magistrate Judge

24

## **ATTACHMENT A**

The property to be searched includes:

      a. **DEVICE-1**: silver/blue Apple iPhone 13 Pro Max, Model A2484, IMEI:

         35950820120054.

      b. **DEVICE-2:** black Apple iPhone 7, Model A1660, IMEI: 359463086579239.

The Subject Devices are currently in the lawful possession of the Montgomery County Sheriff's

Office, 345 W. Second Street, Dayton, Ohio.

      This warrant authorizes the forensic examination of the Subject Devices for the purpose

of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.      All records on the Subject Devices described in Attachment A that relate to

violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances);

21 U.S.C. § 843(b) (use of a telephone communication facility to facilitate a drug trafficking

crime); 21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances);

21 U.S.C. § 856 (maintaining a drug premises); 18 U.S.C. § 924(c) (possession of a firearm

during a drug trafficking crime); and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm)

(hereinafter and collectively "Subject Offenses") and involve David MINOR:

    a.   lists of customers and related identifying information;

    b.   types, amounts, and prices of drugs trafficked as well as dates, places, and
         amounts of specific transactions;

    c.   any information related to sources of drugs (including names, addresses, phone
         numbers, or any other identifying information);

    d.   any information recording MINOR's schedule or travel;

    e.   all bank records, checks, credit card bills, account information, and other financial
         records.

2.      Evidence of user attribution showing who used or owned the Device at the time

the things described in this warrant were created, edited, or deleted, such as logs, phonebooks,

saved usernames and passwords, documents, and browsing history;

This warrant authorizes a review of electronic storage media and electronically stored

information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**ATTACHMENT C**

21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances)

21 U.S.C. § 843(b) (use of a telephone communication facility to facilitate a drug trafficking crime)

21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances)

21 U.S.C. § 856 (maintaining a drug premises)

18 U.S.C. § 924(c) (use and carrying of a firearm during and in relation to a drug trafficking crime)

18 U.S.C. § 922(g)(1) (felon in possession of a firearm)